```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
U.S. LICENSING ASSOCIATES, INC.,             :
                                             :
        Plaintiff,                           :
                                             :       11 CV 4517 (HB)
        - against -                          :
                                             :       OPINION &
THE ROB NELSON COMPANY,                      :       ORDER
                                             :
        Defendant.                           :
-----------------------------------------------------------x
```

**Hon. Harold Baer, Jr., District Judge:**

Before the Court is a motion for summary judgment brought by defendant The Rob Nelson Company ("RNC") and a cross-motion for partial summary judgment brought by plaintiff U.S. Licensing Associates, Inc. ("USLA"). For the reasons set forth below, both motions are DENIED.

## I. BACKGROUND[1]

An additional description of the facts of this case is provided in this Court's recent decision granting in part and denying in part RNC's motion to dismiss the amended complaint, familiarity with which is assumed. *USLA v. RNC*, 11 Civ. 4517, 2011 WL 5910216 (S.D.N.Y. Nov. 28, 2011). That opinion dismissed Plaintiff's second and third causes of action, leaving a single cause of action for breach of contract.

Pursuant to a license agreement ("1992 License Agreement"), RNC's predecessor in interest, the Jim Bouton Corporation ("JBC") licensed the use of trademarks for a shredded gum called Big League Chew to the predecessor in interest of non-party Wrigley WM Jr. Co. ("Wrigley"), Amurol Products Company ("Amurol") in exchange for a 5-year agreement, which was subsequently renewed, under which Amurol would pay JBC 6.5 percent of the net sales of Big League Chew, with a Guaranteed Minimum Royalty of $500,000.00 each year. RNC 56.1 ¶ 1; ULSA 56.1 ¶ 2, 1992 License Agreement ¶¶ 5, 6. The Guaranteed Minimum Royalty was increased to $530,000.00 in 2009. Feureisen Decl. ¶ 26. USLA acted as an agent for JBC and facilitated the original license agreement between JBC and Amurol. Alati Decl. ¶¶ 3-4. As compensation for its facilitation of this agreement, USLA also entered into a contract ("1992 Contract") with JBC, through which USLA was promised 1.5 percent of the sales of Big League Chew, Seymour Decl.

---

[1] This section is provided for background purposes only and facts are disputed where noted. Additional facts are provided where they are relevant throughout the opinion.

Ex. B, 1992 Contract ¶ 2b, or if the sales were below the Guaranteed Minimum Royalty, USLA would be entitled to 23 percent of the difference between the Guaranteed Minimum Royalty and the actual royalties earned. *Id.* at ¶ 4b. JBC later assigned all its rights, obligations and liabilities under the 1992 Agreement and 1992 Contract to RNC and Amurol assigned its rights, obligations, and liabilities under the 1992 License Agreement to Wrigley. RNC 56.1 ¶¶ 5, 6.

The second term of the 1992 License Agreement ended on December 31, 2001 and was renewed on January 1, 2002. *Id.* at ¶ 7. Approximately two years before the 1992 License Agreement was set to expire, Wrigley notified RNC that it wanted to terminate the agreement early in exchange for payment of the 2011 Guaranteed Minimum Royalty. RNC 56.1 ¶¶ 11-12; USLA 56.1 ¶¶ 12-13. Instead, RNC waived its right to the 2011 Guaranteed Minimum Royalty, and Wrigley agreed to sell the equipment it had used to manufacture Big League Chew Products pursuant to the Termination Agreement to RNC. RNC 56.1 ¶¶ 15-16; USLA 56.1 ¶¶ 18-21. The parties dispute whether or not this equipment was sold to RNC at a vastly reduced price. RNC 56.1 ¶¶25-27, 32; USLA Response to RNC 56.1 ¶¶ 16, 25. Wrigley also agreed not to sell a competing product, USLA 56.1 ¶ 21, and helped RNC with transitional matters including transferring trademarks, websites, formulas, inventory and customer lists. Feureisen Decl. ¶ 15. The parties also dispute whether this assistance and the non-compete had any value. USLA Opp. 17-24; RNC MSJ 12-16.

The 1992 Contract, 1992 License Agreement and the Termination Agreement explicitly state that the agreements should be construed under the laws of the state of New York. Seymour Decl. Ex. B, 1992 Contract ¶ 7; Seymour Decl. Ex. A, 1992 License Agreement ¶ 31; Seymour Decl. Ex. D, Termination Agreement ¶ 10(c).

## II. LEGAL STANDARD

Summary judgment shall be granted in favor of a movant where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must resolve all ambiguities and draw all inferences against the moving party. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). The movant bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A material fact "might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (internal citation omitted). "The party against whom summary judgment

2

is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is *a genuine issue for trial.*' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

New York rules govern choice-of-law questions in diversity actions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941). Under New York law, "a contractual choice-of-law provision is generally binding on a party claiming rights under a contract." *CIH Int'l. Holdings, LLC v. BT United States, LLC*, No. 10 Civ. 7790, 2011 WL 4483983, at *4 (S.D.N.Y. Sept. 28, 2011) (citing *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (relying on New York Contract law to resolve issues raised in the case).

### III. DISCUSSION

### A. There is a Genuine Issue of Material Fact Regarding Whether RNC Breached the 1992 Contract with USLA

In the sole remaining Count, USLA alleges that RNC breached the 1992 Contract with USLA by "waiving the 2011 Minimum Guaranteed Royalty," Compl. ¶ 37, and "by failing to pay plaintiff USLA the greater of 23% of the 2011 Minimum Guaranteed Royalty or 23% of the valuable consideration that Wrigley gave RNC for defendant RNC's promise to waive the 2011 Minimum Guaranteed Royalty." *Id.* at ¶ 38. The parties cross move for summary judgment on the issue of whether RNC breached the 1992 Contract.[2]

Paragraph 11 of the 1992 Contract reads:

> 11. Notwithstanding anything contained herein to the contrary, in the event of any amendment, modification, extension, renewal and/or an agreement between JBC and LICENSEE and/or their respective successors and assigns, entered into in substitution of the License Agreement between JBC and LICENSEE, and regardless of the prior termination or expiration of the term of said License Agreement, USLA shall nonetheless continue to be entitled to receive a percentage of advances, royalties and Guaranteed Minimum Royalties or other consideration received by JBC and/or its successors and assigns from LICENSEE and/or its successors and assigns with respect to each such amendment, modification, renewal and/or substitution of said License Agreement as follows:

---

[2] RNC is correct that to the extent USLA argues that the early termination of the License Agreement itself constituted a breach of the 1992 Contract, that argument fails as a matter of law. RNC MSJ 6. Nothing in the 1992 Contract prohibits early termination of the License Agreement; to the contrary, the 1992 Contract expressly contemplates early termination of the 1992 License Agreement. Seymour Decl. Ex. B, 1992 Contract ¶ 11 (indicating that USLA will receive consideration for agreements "entered into in substitution of the License Agreement" regardless of "the prior termination or expiration of the term of said License Agreement").

3

       a. From January 1, 1992 to June 30, 1993 – 27%

       b. From July 1, 1993 to expiration or termination of the License Agreement as may be amended, modified, renewed and/or substituted therefor – 23%

Seymour Decl. Ex. B, 1992 Contract ¶ 11.

    Under New York law, whether a written contract is ambiguous calls for a legal determination. *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011). "Ambiguous language is that which suggests 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 174 (2d Cir. 2001) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997)). "[T]he meaning of an ambiguous contract is a question of fact for a factfinder." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) (citing *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir.2000)).

    The two readings urged by the parties are plausible. In my earlier opinion, I explained that it was a plausible reading of the contract that the Termination Agreement fell into the category of an agreement entered into "in substitution of" the License Agreement. *USLA v. RNC*, 2011 WL 5910216, at *3-*4. Both parties offer persuasive arguments in support of finding that the Termination Agreement does or does not fall into the category of agreements for which USLA was entitled to receive consideration. RNC argues that paragraph 11b, indicating that USLA was to receive consideration "to . . . termination of the License Agreement" means that USLA would only receive consideration *until* termination, but not *for* termination. RNC MSJ 7. USLA, on the other hand, points to evidence suggesting that the consideration received for the Termination Agreement falls within Paragraph 11. For example, that paragraph indicates that USLA will receive consideration for agreements "in substitution" of the License Agreement "regardless of the prior termination or expiration of the term of said License Agreement." Seymour Decl. Ex. B, 1992 Contract ¶ 11. The conflicting language of Paragraph 11 renders the contract ambiguous, and the

4

issue of whether RNC has breached its obligations by failing to provide USLA with consideration allegedly received cannot be resolved on summary judgment.[3]

RNC also argues that the words surrounding "substitution" suggest that the Termination Agreement does not count as an agreement entered into "in substitution of" the License Agreement because the other types of contracts in Paragraph 11—amendments, modifications, and renewals—all require a continuing duty to perform. RNC MSJ 8.  Under the doctrine of *ejusdem generis*, "the meaning of a word in a series of words is determined 'by the company it keeps.' " *242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.*, 815 N.Y.S.2d 507, 507 (App. Div. 2006) (internal citation omitted).  This suggests that a termination agreement "would not belong within this list of agreement types." RNC MSJ 8.  USLA responds that the Termination Agreement required an ongoing duty to perform as well. USLA MSJ & Opp. 14 (explaining that the Termination Agreement included ongoing duties, among others, including absolving Wrigley from the obligation to sell Big League Chew, requiring Wrigley to sell the equipment and assist in the transition to a new manufacturer, and prohibiting Wrigley from competing with Big League Chew).[4]

"When the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for a jury to resolve, thereby precluding summary judgment." *Harris*, 259 F.3d at 83.  It is a rare case where the extrinsic evidence is so one-sided that a court should resolve the ambiguity as a matter of law. *Id.*  Both sides offer evidence of the intent of the parties in drafting the 1992 Contract. *Compare* Alati Decl. ¶ 10 ("It was always intended that pursuant to paragraph 11 of the 1992 Contract, USLA is entitled to its share of any consideration which the Licensor receives from the Licensee pursuant to the License Agreement or any other agreement which is made in substitution of the license agreement, regardless of any prior termination of the License Agreement."); RNC Reply 6 (arguing that the course of dealings under the contract suggests that Paragraph 11 did not include termination

---

[3] Even if, as RNC argues, USLA was only entitled to compensation "to . . . termination," USLA is correct that "a genuine issue of material fact would exist as to whether the License Agreement was terminated before or after the valuable consideration was received by RNC." USLA MSJ & Opp. 13-14.

[4] RNC asserts that the doctrine of *contra proferentem* ought to apply to this contract, which according to RNC, was drafted by USLA.  First, although the doctrine of *contra proferentem* may, as RNC argues, apply beyond the adhesion contract context, "the touchstone for applying *contra proferentem* is the [non-drafter's] lack of sophistication." *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir. 1991).  Neither party here lacked sophistication. There is also a genuine issue of material fact regarding whether the contract was drafted by USLA. *Compare* Bouton Decl. ("USLA drafted the 1992 Contract between USLA and JBC, and to my best recollection, it was signed by me without any changes."), *with* Franklin Decl. ("During the negotiations and drafting of the 1992 Contract, multiple drafts were reviewed and edited by both Steven Pokotilow, Esq., on behalf of JBC, and by me, on behalf of USLA.").

agreements). Because there is a genuine issue of material fact regarding whether RNC breached the 1992 Contract by failing to pay USLA a portion of the valuable consideration it received in exchange for the Termination Agreement, RNC's motion for summary judgment and USLA's cross-motion for summary judgment are both denied.[5]

**B. Damages**

### 1. USLA Was Given an Opportunity to Cure its Damages Defect

In its Supplemental Disclosures, USLA offered four possible pathways in order to provide a calculation of damages, three of which are barred. Seymour Decl. Ex. K, Supp. Disclosures. The first two categories of damages sought compensation for RNC's waiver of the Guaranteed Minimum Royalty for 2011. *Id.* at ¶¶ (C)1, (C)2. As explained above, to the extent that USLA argues that terminating the 1992 License Agreement and waiving the Guaranteed Minimum Royalty was itself a breach of the 1992 Contract, that argument fails. *See supra* n.2. The fourth damages claim,[6] which sought the "amounts that U.S. Licensing Associates, Inc. was underpaid pursuant to the royalty agreement with The Rob Nelson Company," is also barred. *Id.* at ¶ (C)4. I dismissed the royalty claim in deciding RNC's motion to dismiss, and although I provided leave to replead, USLA never took advantage of that opportunity. *See USLA*, 2011 WL 5910216, at *4-*5.

The only viable damages theory raised by USLA is as follows:[7]

> [T]hirty-five percent of the value of any and all consideration received in connection with The Rob Nelson Company's waiver of the 2011 Guaranteed Minimum Royalty and the early Termination of the Big League Chew License Agreement, including but not limited to the value of the equipment transferred to the Rob Nelson Company from WM. Wrigley Jr. Company and the value of the non-compete clause between The Rob Nelson Company and WM. Wrigley Jr. Company.

Seymour Decl. Ex. K, Supp. Disclosures ¶ (C)3. In its Supplemental Initial Disclosures, USLA indicated that it did not have "sufficient information or documents" to calculate damages on this theory.

---

[5] RNC argues that the Alati Declaration cannot be used to create a genuine issue of material fact. *See* RNC Reply 4 (citing *Fisher v. AW Miller Technical Sales, Inc.*, 762 N.Y.S.2d 205, 205 (App. Div. 2003) ("Moreover, even assuming, arguendo, that the term 'accepted' as used in the contract is ambiguous, we conclude that plaintiff's subjective understanding is not competent parol evidence to explain its meaning.")). However, Plaintiff does not create a genuine issue of material fact with the Alati Declaration. Rather, I conclude that the contract is ambiguous on its face, and that the Alati Declaration is one piece of extrinsic evidence that might be used by a jury to determine its meaning.

[6] This is misnumbered as number 3.

[7] This is misnumbered as number 2. As explained below, the correct percent that USLA is entitled to is 23 percent.

6

In its memorandum and reply, RNC argued that I ought to preclude damages testimony on the third theory because Rule 26(a)(1)(A)(iii) requires a "computation of each category of damages" along with supporting "documents or other evidentiary material" "on which each computation is based." RNC MSJ 9-15. USLA responded that it should not be precluded from proving damages "merely because there is an issue of amount." USLA MSJ & Opp. 22-23 (quoting *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376-391-92 (2d Cir. 2006) (explaining that a breaching party "should not be permitted entirely to escape liability because the amount of damages which he has caused is uncertain")).[8] The rationale that " 'the burden of uncertainty [] is upon the wrongdoer'. . . has no application here where there has not yet been a determination regarding liability." *Design Strategy, Inc. v. Davis*, 367 F. Supp. 2d 630, 635-36 (S.D.N.Y. 2005), *aff'd* 469 F.3d 284 (2d Cir. 2006) (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 174-75 (2d Cir. 2000)). USLA does not assert that RNC improperly withheld any necessary information in the course of discovery, and "[a] party is not excused from making its disclosures because it has not fully investigated the case." Fed. R. Civ. Proc. 26(e). That there is a disputed amount of damages, or that damages are generally a question of fact for the jury, is not the issue. Rather, USLA had never identified even in ball park figures what amount of damages it intended to seek, or on what evidence that amount would be based.

Turning to what, if any, sanction to impose under Rule 37 (c)(1), courts consider: (1) the party's explanation for the failure to comply; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). While a party may defend non-disclosure on the basis that it was substantially justified or harmless, Fed. R. Civ. Proc. 37(c)(1), USLA has no such explanation for its failure to comply with Rule 26. Furthermore, prejudice to RNC from receiving damages calculations just a few weeks before trial and well after discovery has closed is high. On the other hand, the importance of the precluded evidence to USLA is not only high, it is essential. A district court has wide discretion to impose

---

[8] USLA relies on *Kingsway Financial Services, Inc. v. Pricewaterhouse-Coopers LLP*, 03 Civ. 5560, 2006 WL 1520227 (S.D.N.Y. June 1, 2006), for the proposition that "an exact computation need not be disclosed where it will be contingent on expert evidence at trial." USLA Reply 10. That case is quite clearly distinguishable. The Court in *Financial Services* did not hold that the plaintiff did not have to provide damage calculations, but concluded simply that, where the damage calculations would be based on expert evidence, the calculations could be part of Rule 26 expert disclosures rather than initial disclosures. *Id.* at *1 ("Where, as here, the plaintiff's damages are not the product of a simple mathematical calculation and require expert testimony, the damages calculations need not be produced with the plaintiff's Rule 26(a)(1) disclosures and may be produced as part of the party's Rule 26(a)(2) disclosures.").

7

sanctions, including severe sanctions, under Rule 37, and its ruling will be reversed only if it constitutes an abuse of discretion. *See Patterson*, 440 F.3d at 117.

After a careful consideration of the *Patterson* factors, *id.*, prohibiting USLA from any testimony on the issue of damages would be unfair and unnecessary. It is within my discretion to fashion another appropriate remedy in lieu of sanctions, and I offered USLA a final opportunity to provide RNC with its damages computations and the basis for those damages that it intends to present to a jury in a letter dated March 22, 2012. I gave USLA one week to provide this information and stated that the calculations could not be based on any evidence not produced during discovery unless USLA could demonstrate that the failure to produce the information earlier was substantially justified or harmless. March 22, 2012 Letter; *see Serin v. N. Leasing Sys., Inc.*, No. 06 Civ. 1625, 2010 WL 6501664, at *1 (S.D.N.Y. Oct. 26, 2010) (ordering the plaintiffs to comply with Rule 26(a)(1)(A)(iii) and to make full disclosures of damages within 3 days where the plaintiffs had timely provided expert evidence and other documents on which the damage calculation would be based, but failed to provide the final calculation). USLA has since provided such calculations and RNC has not objected to them. Based on USLA's representations at oral argument on April 2, 2012 and in their reply to my March 22 letter, that there would be additional support for this theory of damages in tax documents that would be filed by RNC on June 15, 2012, I have also adjourned the trial, previously scheduled for May 14, 2012 to the August trailing trial calendar. This will also alleviate any prejudice to RNC.

### 2. USLA is Only Entitled to 23 Percent of Consideration Received by RNC

USLA's assertion that it is entitled to "35 percent of the value of any and all consideration received" is incorrect. This assertion is based on Paragraph 17 of the 1992 Contract, which reads as follows:

> In the event that the License Agreement is amended, modified, renewed and/or substituted therefor as provided in ¶ 11 hereof and the provisions of such License Agreement are so amended, modified renewed and/or substituted so that the royalty due from LICENSEE to JBC, or from and to their respective successors and assigns, is less than six and a half (6.5%) percent of LICENSEE's net sales, then and in such event, USLA shall be entitled to thirty five (35%) percent of any royalties and other consideration of every nature and kind paid by LICENSEE, its successors and assigns, to JBC, its successors and assigns, pursuant to such new agreement between JBC and LICENSEE.

A plain reading of Paragraph 17 makes it clear that the language provides 35 percent of "any royalties and other consideration" is applicable to the situation where RNC and Wrigley entered into a new *license agreement* pursuant to which RNC was only to collect 6.5 percent of Wrigley's net sales.  Paragraph 17 does not apply to the Termination Agreement at issue here.  Although RNC does not directly address this discrepancy, in its memorandum in support of summary judgment it characterizes USLA's third theory of damages as a "fail[ure] to provide USLA with 23% of the consideration it was provided by Wrigley to enter into the Termination Agreement."  If the jury concludes that the Termination Agreement is one for which USLA ought to receive any consideration under Paragraph 11 of the 1992 Contract, the most USLA can receive is 23 percent of that consideration.

### 3. There is a Genuine Issue of Material Fact Regarding the Amount of Potential Damages Sustained by USLA

Viewing the facts in a light most favorable to USLA, there is a genuine issue of material fact regarding whether USLA sustained damages.  USLA argues that RNC received consideration for the Termination Agreement that it has not shared with USLA, in violation of Paragraph 11 of the 1992 Contract. USLA 56.1 ¶ 24.  Among other disputed items, USLA suggests that the BLC equipment, purchased for $169,999.98, was worth far more than the purchase price. *See* Feureisen Decl. Ex. E, Email from Rob Nelson to Melanie Domer 10/29/2009 ("The value of the equipment is approximately $350K."); Feureisen Decl. Ex. K, Email from Rob Nelson to Bob Anderson 7/12/2010 (suggesting valuation of the equipment at $375,000.00 to obtain better financing); Feureisen Decl. Ex. U, AmerEquip International Appraisal (valuing equipment at $666,666.00).  USLA also asserts that the non-compete has a value of $530,000 because the Termination Agreement stated that the royalty was adequate consideration for the non-compete. 3/29/2012 USLA Letter to Court.  In addition, USLA indicates that the sizzle reel, market material provided to RNC by Wrigley cost $7,500.00. *Id.*  As noted above, USLA predicts that RNC's June tax filings will likely provide additional support for this theory of damages.  For each of these items, USLA asserts that it is entitled to 35 percent of the consideration received by RNC, but as noted above USLA is entitled to at most 23 percent.  In contrast, RNC asserts that the equipment was sold at market price. Seymour Decl. Ex. I, Mantulewicz Dep. 26:17-27:8 (explaining that Wrigley's valuation of the equipment "was close to the purchase price"); Seymour Decl. Ex. J, Copy of

Invoice Submitted to Customs (estimating value at $178,804.66).[9] There is a genuine issue of material fact regarding the amount of damages.

## IV. CONCLUSION

For the foregoing reasons, USLA's motion for partial summary judgment and RNC's motion for summary judgment are both DENIED. The Clerk of the Court is instructed to close both motions and remove them from my docket.

**SO ORDERED**
**April 26, 2012**
**New York, New York**

_____
U.S.D.J.

---

[9] RNC has not had a chance to respond to some of these damage calculations because USLA only provided them in its letter to the Court on March 29, 2012.

10